THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| BARBARA JOHNSON, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | |
| v. | Civil No. 09-1799 (JBS/KMW) |
| NOVASTAR MORTGAGE, INC., et al., | **OPINION** |
| Defendants. | |

APPEARANCES:

Matthew Benjamin Weisberg, Esq.
PROCHNIAK WEISBERG, PC
7 South Morton Avenue
Morton, PA 19070
    Counsel for Plaintiff Barbara Johnson

Clement J. Farley, Esq.
Jeffrey K. Daman, Esq.
MCCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
    Counsel for NovaStar Mortgage, Inc.


**SIMANDLE**, District Judge:

I.    **INTRODUCTION**

     The present action is born of an alleged foreclosure rescue

scam, in which Plaintiff Barbara Johnson was lured into two sale

transactions designed, in theory, to keep her in her home.

Ultimately, she was evicted.  Plaintiff seeks relief against all

defendants for violations of the Truth-in-Lending Act ("TILA") as

amended by the Home Ownership and Equity Protection Act

("HOEPA"), the New Jersey Consumer Fraud Act ("CFA"), as well as claims of fraud[1] and conspiracy/aiding and abetting (presumably in the commission of the other alleged violations).[2]  Defendant NovaStar Mortgage, Inc. ("Defendant" or "NovaStar") has moved to dismiss [Docket Item 11] Plaintiff's amended complaint pursuant to Rule 12(b)(1), Fed. R. Civ. P., for lack of standing, and Rule 12(b)(6), Fed. R. Civ. P., as untimely and for failure to state a claim.[3]  Defendant maintains that Plaintiff was not a consumer of NovaStar's credit services, offered during the second sale-leaseback transaction, because Plaintiff had previously sold her home to her daughter in the first sale transaction, and so Plaintiff lacks standing and cannot state a claim against NovaStar.  Plaintiff responds that neither transaction was, in

---

[1] Plaintiff in her opposition abandons her claim of fraud against NovaStar only and so that Court will dismiss this claim. (Pl. Opp'n Part III.)

[2] In addition to the moving defendant, NovaStar, Plaintiff has sued virtually all the other alleged players in this scam, with the exception of her daughter.  Against some of those defendants she also asserts claims under the Credit Repair Organization Act and common law claims for breach of contract, negligence, breach of good faith and fair dealing, and breach of a fiduciary duty.  Because only NovaStar has moved to dismiss, the Court will not address those causes of action.

[3] This is Defendant NovaStar's second motion to dismiss.  On June 5, 2009, NovaStar moved to dismiss Plaintiff's initial complaint [Docket Item 5].  Plaintiff subsequently amended her complaint [Docket Items 7 & 8] and Defendant filed this subsequent motion to dismiss the amended complaint.  The Court will consequently dismiss NovaStar's first motion to dismiss Plaintiff's initial complaint as moot.

truth, a sale, but instead an equitable mortgage designed to help Plaintiff avoid foreclosure of her home.[4]

The Court finds, as will be explained below, that Plaintiff has alleged sufficient facts to support her allegation that both sale-leaseback transactions in truth created two equitable mortgages, so that Plaintiff has stated a claim under the TILA and HOEPA as well as the CFA against NovaStar, and though any claims for statutory damages under TILA and HOEPA are untimely, she may continue her action for rescission of the second equitable mortgage under the TILA.  Plaintiff may also pursue her claim for civil conspiracy against Defendant NovaStar.

## II.  BACKGROUND

### A.  Facts

On this motion to dismiss, the Court will take Plaintiff's factual allegations in her complaint to be true and construe all facts in her favor.

---

[4] The Court observes that, despite the obvious complexity of such an argument, Plaintiff's counsel has not provided the Court with a single piece of authority from the appropriate jurisdiction, citing only to a Florida District Court of Appeal decision interpreting a Florida statute, and an unpublished (and unavailable on either Westlaw or Lexis) order from the Eastern District of Pennsylvania interpreting Pennsylvania law.  This is not due to an absence of relevant jurisprudence from New Jersey, to be discussed at length below.  The Court trusts that as this case proceeds, Plaintiff's counsel will heed his obligations under Rules 1.1 and 1.3 of the New Jersey Rules of Professional Conduct and provide Plaintiff with better service than she allegedly received at the hands of the defendants.

Sometime in 2005, Plaintiff fell behind on her mortgage payments for her home in Sicklerville, New Jersey, because injuries prevented her from working.  (Am. Compl. ¶ 18.) Plaintiff learned from a friend about Rick Mason, who does business as Innovative Mortgage Solutions.  (Id. ¶ 19.)  Mason contacted Plaintiff and arranged a meeting with her, where he told Plaintiff that her credit score was too low for refinancing, but recommended that she sell her home to her daughter, Ravenda Dallah. (Id. ¶¶ 20-21.)  Mason explained that he would broker a loan based on the equity in Plaintiff's home to pay Plaintiff's original mortgage until Plaintiff's credit score improved sufficiently for Plaintiff to qualify for a refinanced mortgage in her own name, at which time the home would be transferred back to Plaintiff's name.  (Id. ¶ 21.)

Plaintiff accepted Mason's plan.  On June 7, 2005, Plaintiff attended a closing with her daughter at Trinity Insurance Abstract, LLC, at which lender New Century closed a loan of $175,000 of which Plaintiff received roughly $20,000.  (Id. ¶ 22.)  Plaintiff signed over the deed to her daughter.  (Id. ¶ 23.)

Plaintiff remained in the home with her daughter.  (Id. ¶ 24.) In April 2005 [apparently should be 2006], Plaintiff reached out to Mason, explaining that the funds from the first transaction were "running out" and that she wanted to pursue another loan.  (Id. ¶ 25.) After some time, Mason responded and insisted that Plaintiff's credit score was still too low for a loan in her name.  (Id. ¶ 26.)  Instead, Mason suggested yet another "sale," this time to an "investor," once again until Plaintiff's credit score improved.  (Id. ¶ 27.)  To that

4

end, Mason prepared a "lease purchase agreement" between Plaintiff and the investor, Terence Ward, and had Plaintiff sign the agreement. (Id. ¶¶ 27-28.)

On June 23, 2006, Plaintiff and her daughter attended a closing at Trinity's offices at which Defendant NovaStar closed a loan of $238,000.  (Id. ¶ 29.)  Plaintiff's daughter received approximately $10,000 and signed the deed to Ward.  (Id. ¶ 29-30.)  Ward, however, was not present at the closing and neither Plaintiff nor her daughter had met Ward.  (Id. ¶ 31.)

The arrangement with NovaStar was orchestrated through Mason. (Id. ¶¶ 34-37.)  Mason had a contact within NovaStar and that unnamed representative "ensured the above closing would proceed no matter the ability or intent of Ward to make payments on the property by, among other things, ensuring that an inflated appraisal was performed to obtain the necessary loan to value ratio to support the increased loan principal."  (Id. ¶¶ 34-35.)  NovaStar received application and commitment fees that were not disclosed to Plaintiff.  (Id. ¶ 37.)

Plaintiff made monthly payments to NovaStar until approximately one year after the second sale-lease transaction.[5]  (Id. ¶¶ 39-40.)

---

[5] Although somewhat unclear, it appears from the amended complaint that Plaintiff was making payments directly to NovaStar and not through Ward.  Paragraphs 39 and 40 read: "Approximately one year later, funds from Loan 2 [presumably the $10,000 from the second sale-lease transaction] ran out and plaintiff was unable to make the monthly payments to Lender [NovaStar].  After plaintiff ceased making monthly payments on Loan 2 [presumably the second sale-lease transaction loan of $238,000], Mason and an individual Mason introduced as Defendant Ward appeared at the Premises and demanded plaintiff pay $10,000 to them to straighten out the arrears problem with Loan 2 that plaintiff was experiencing."

After Plaintiff stopped making those payments, Mason and an individual who Mason introduced as Ward arrived at Plaintiff's home and demanded that Plaintiff pay them $10,000 "to straighten out the arrears problem with Loan 2 that plaintiff was experiencing." (Id. ¶ 40.) Plaintiff apparently did not resolve the debt to NovaStar and in January 2008 NovaStar initiated foreclosure proceedings on the home against Ward. (Id. ¶ 42.) In August 2008, Plaintiff was evicted from her home. (Id. ¶ 43.)

Plaintiff alleges that she was the "implied borrower" from NovaStar. (Id. ¶ 36.) She states that she was not represented by counsel at either sale-lease transaction and that she believed both transactions were to enable her to keep her home. (Id. ¶¶ 44-45.) Plaintiff alleges that NovaStar's loan lacked necessary disclosures under the TILA, including Plaintiff's right to rescind the transaction, the amount financed and the finance charge. (Id. ¶ 54.)

**B.   Procedural History**

On April 15, 2009, Plaintiff filed her initial complaint, which she subsequently amended on June 22, 2009. Subsequently, Defendant NovaStar filed the instant motion to dismiss Plaintiff's amended complaint. Plaintiff filed her opposition raising her argument regarding equitable mortgage, and NovaStar did not file any reply.

**III.  DISCUSSION**

    **A.    Standard of Review**

        1.    Rule 12(b)(1)

Defendants move to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), Fed. R. Civ. P., on the grounds that Plaintiff lacks standing.  Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007) ("A motion to dismiss for want of standing is also properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter.").  An attack on subject matter jurisdiction can be either facial -- based solely on the allegations in the complaint -- or factual -- looking beyond the allegations to attack jurisdiction in fact.  Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).  Where, as here, the challenge to subject matter jurisdiction is facial, the Court must, for the purposes of this motion, take all the allegations in the complaint to be true and construe them in the light most favorable to the Plaintiffs.  Id.

        2.    Rule 12(b)(6)

In deciding Defendant NovaStar's motion to dismiss pursuant to Rule 12(b)(6), the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008) (quoting Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  Thus, "to

7

survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, ---U.S. ---, 129 S. Ct. 1937, 1949 (2009); Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

> Therefore, after Iqbal, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. [Iqbal, 129 S.Ct. at 1950.] Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." Id. [] In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts. See Phillips, 515 F.3d at 234-35.

Fowler, 578 F.3d at 210-11.

"In deciding motions to dismiss pursuant to Rule 12(b)(6), courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." Lum v. Bank of America, 361 F.3d 217, 222 n.3 (3d Cir. 2004) (citation omitted).

### B.    Standing and Equitable Mortgages

Defendant NovaStar argues that Plaintiff was not a consumer, borrower, or buyer entitled to relief under the TILA, HOEPA, or the Real Estate Settlement Procedures Act ("RESPA"),[6] and therefore she cannot have been injured under these statutes.  Defendant asserts that Plaintiff played no role in the second sale-lease transaction, because she had sold the home to her daughter and thus was no longer the owner of the home.  The loan, Defendant argues, was to Ward and so Plaintiff had no business relationship with NovaStar.  Plaintiff responds (albeit without referencing relevant case law, see note 4, supra) that neither transaction was actually a "sale," but rather produced an equitable mortgage in which Plaintiff was the borrower.  The Court finds that Plaintiff has alleged sufficient facts, if taken as true and construed in Plaintiff's favor, to show that both transactions created equitable mortgages under New Jersey law and that Plaintiff was a consumer for the purposes of the various remedial statutes.

In order to have rights under the TILA and the HOEPA, Plaintiff must be a "consumer" of credit.  In re O'Brien, --- B.R. ----, 2010 WL 251660, at *7 (Bankr. D.N.J. Jan. 22, 2010); see 15 U.S.C. §§ 1631, 1601(a) ("It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer

---

[6] Though not a separate cause of action, Plaintiff alleges that NovaStar's violation of RESPA is a basis for liability under the CFA.

against inaccurate and unfair credit billing and credit card

practices."). A consumer credit transaction is defined as:

> The adjective "consumer", used with reference to a
> credit transaction, characterizes the transaction as one
> in which the party to whom credit is offered or extended
> is a natural person, and the money, property, or
> services which are the subject of the transaction are
> primarily for personal, family, or household purposes.

15 U.S.C. § 1602(h). Thus, courts within this circuit have held that

in order to show an injury under the TILA and HOEPA, "Plaintiff must

have been doing business with Defendant." Talley v. Deutsche

Bank Trust Co., No. 07-4984, 2008 WL 4606302, at *2 (D.N.J. Oct.

15, 2008); Weiner v. Bank of King of Prussia, 358 F.Supp. 684, 692

(E.D. Pa. 1973) ("It is obvious that in order for a bank to be

obligated to disclose credit terms to an individual, that

individual must be doing business with that bank.")

    In order to determine whether Plaintiff did business with

NovaStar, it is necessary to look at the two alleged transactions in

light of New Jersey's long-held doctrine of equitable mortgage. See

Rutherford Nat. Bank v. H.R. Bogle & Co., 169 A. 180, 182 (N.J.Ch.

1933) ("To dedicate property, or to agree to do so, to a particular

purpose or debt, is regarded in equity as creating an equitable lien

thereon in favor of him for whom such dedication is made. This

wholesome equitable principle is one of wide, if not universal,

recognition and application."). The law governing mortgages is

extraordinary as compared to the rigid requirements of traditional

contract law, requiring courts to look beyond the plain terms of the

contract to determine the essence of the agreement.

> In general, all persons able to contract are
> permitted to determine and control their own legal
> relations by any agreements which are not illegal,
> or opposed to good morals or to public policy; but
> the mortgage forms a marked exception to this
> principle. The doctrine has been firmly established
> from an early day that when the character of a
> mortgage has attached at the commencement of the
> transaction, so that the instrument, whatever be
> its form, is regarded in equity as a mortgage, that
> character of mortgage must and will always
> continue. If the instrument is in its essence a
> mortgage, the parties cannot by any stipulations,
> however express and positive, render it anything
> but a mortgage, or deprive it of the essential
> attributes belonging to a mortgage in equity.

Humble Oil & Refining Co. v. Doerr, 303 A.2d 898, 906-07 (N.J.

Super. Ct. Ch. Div. 1973) (quoting 4 Pomeroy, Equity Jurisprudence

§ 1193 (5th ed. 1941)).

Consequently, New Jersey courts have repeatedly found that sale-

leaseback arrangements made to avoid foreclosure are in fact equitable

mortgages. Essex Property Servs., Inc. v. Wood, 587 A.2d 1337

(N.J. Super. Ct. Law Div. 1991); James Talcott, Inc. v. Roto Am.

Corp., 302 A.2d 147, 156-57 (N.J. Super. Ct. Ch. Div. 1973)

("There are numerous authorities for the proposition that an

absolute conveyance intended as security for an obligation will

be treated as a mortgage."); Humble Oil, 303 A.2d at 909 ("It is

clear that equity looks to substance rather than form, and that a

guarantor or surety who takes property or an interest therein as

security for his guaranty is a mortgagee thereof in equity.").

The Essex Property court explained, when considering whether a sale-

leaseback arrangement to avoid foreclosure created a landlord-tenant

relationship, that "Substance must control the form."  587 A.2d at

1139.  The court went on:

> I find it inescapable that originally the parties
> contemplated that their transaction was a method of
> temporary refinancing and that both parties
> contemplated that defendants would "re-purchase"
> the property. The relationship of landlord and
> tenant was incidental to that mutual and dominant
> contemplation. . . .
>
> My conclusion (i.e., temporary financing
> transaction rather than landlord-tenant
> relationship) results from several factors.  Most
> significant is the common intention expressed by
> the parties; defendants wanted to save their home
> from foreclosure and plaintiff approached them to
> help them save it from foreclosure.

Id.

Most recently, the United States Bankruptcy Court for the

District of New Jersey considered a sale-leaseback transaction where

the debtor "sold" his home to the creditor in a desperate last-minute

attempt to avoid foreclosure, on the theory that he would live in the

home and make payments to the creditor and eventually buy back the

home.  In re O'Brien, 2010 WL 251660, at *1-4.  The court ultimately

concluded that the transaction created an equitable mortgage under New

Jersey law, with the creditor as the mortgagee and the debtor as the

mortgagor, so that there was a consumer credit transaction necessary

for a TILA claim.  Id. at *7-9.  In its analysis, the court identified

a number of factors to consider when determining whether a sale-

leaseback arrangement is, in fact, an equitable mortgage.  They

include: (1) Statements by the homeowner or representations by the

purchaser indicating an intention that the homeowner continue

ownership; (2) A substantial disparity between the value received by
the homeowner and the actual value of the property; (3) Existence of
an option to repurchase; (4) The homeowner's continued possession of
the property; (5) The homeowner's continuing duty to bear ownership
responsibilities, such as paying real estate taxes or performing
property maintenance; (6) Disparity in bargaining power and
sophistication, including the homeowner's lack of representation by
counsel; (7) Evidence showing an irregular purchase process, including
the fact that the property was not listed for sale or that the parties
did not conduct an appraisal or investigate title; and (8) Financial
distress of the homeowner, including the imminence of foreclosure and
prior unsuccessful attempts to obtain loans.  Id. (citing National
Consumer Law Center, Truth in Lending 48 (6th ed. 2007) and Brown v.
Grant Holding, LLC, 394 F. Supp. 2d 1090 (D. Minn. 2005)).

The Court finds the O'Brien factors useful and consistent with
New Jersey equitable mortgage jurisprudence, and so will use them as a
guide to each of the sale transactions at issue in this case.
Beginning with the first arrangement, the Amended Complaint
sufficiently alleges that the first "sale" was in fact an equitable
mortgage.  As to the first factor, even after the supposed "sale,"
Mason executed the subsequent lease purchase agreement between
Plaintiff (and not her daughter) and Ward, which suggests that all
parties considered Plaintiff to be the true owner of the property.
(Am. Compl. ¶¶ 27-28.)  As to the second factor, the Amended Complaint
does not state the actual value of the property as compared to the
$175,000 loan, and so this factor is neither for nor against creation

13

of an equitable mortgage.  As to the third factor, though unclear whether the option to repurchase was included in the terms of the sale, it is clear that the parties understood Plaintiff to have an option to repurchase.  (Id. ¶¶ 19-24.)  As to the forth factor, Plaintiff remained in possession of the property.  (Id. ¶ 24.)  As to the fifth factor, it appears the Amended Complaint alleges that Plaintiff continued to bear ownership responsibilities, including responsibility to pay the various mortgages on the home.  (Id. ¶ 25, 39-40.)  As to the sixth factor, Plaintiff, unlike the lender, did not have legal representation.  (Id. ¶ 23, 44.)  As to the seventh factor, the purchase process was highly irregular, as the home was never listed for sale and Plaintiff's daughter was intended to merely be a straw purchaser.  (Id. ¶ 7).  Finally, as to the eighth factor, Plaintiff alleges she was in financial distress, given her inability to work, her apparently extremely low credit score, her repeatedly desperate attempts to save her home, and the ultimate foreclosure and eviction.  (Id. ¶¶ 18-20, 25-26, 39, 43.)

In light of the above analysis, the Court concludes that the Amended Complaint sufficiently alleges that the first sale-leaseback arrangement was in fact an equitable mortgage, where Plaintiff's daughter became the owner in name only, so that Plaintiff was the mortgagor and New Century loan the mortgagor (with Plaintiff's daughter as a straw mortgagee).  Keeping in mind the command under New Jersey law of equitable mortgage to look at substance over form, Plaintiff remained the equitable owner of her home.

14

Moving to the second sale-leaseback arrangement, for which NovaStar provided the financing, the O'Brien factors (with the exception of the difference, if any, between the value of the home and the value received by Plaintiff, about which the Court lacks information) similarly lead to the conclusion that the Amended Complaint sufficiently alleges that the transaction created an equitable mortgage.  Even after the second "sale," Plaintiff continued to make mortgage payments on the home to NovaStar, suggesting that NovaStar and the other parties (including Plaintiff) considered Plaintiff to still be the true owner of the home, thereby addressing the first factor.  (Am. Compl. ¶ 39-40.)  Plaintiff signed an agreement which included the right to purchase, addressing the third factor.  (Id. ¶ 28.)  Plaintiff continued in possession of the home and continued to make mortgage payments, meeting both the fourth and fifth factors.  (Id. ¶¶ 39-40, 43.)  Plaintiff continued to proceed without counsel and remained in financial distress, meeting the sixth and eighth factors.  (Id. ¶¶ 25, 44.)  Finally, the purchase process for the second transaction was similarly irregular, because the property was not listed for sale and the NovaStar mortgage was issued without regard to whether Ward had the ability or intent to pay.  (Id. ¶¶ 27-31, 35.)

The Amended Complaint thus states a claim that the sale-leaseback transaction involving NovaStar created a second equitable mortgage, in which Plaintiff was the mortgagor and remained the equitable owner of the home.  See Essex Property, 587 A.2d at 1139-40; James Talcott, 302 A.2d at 156-57.  The Court further finds that Plaintiff has

15

alleged sufficient factors to support a finding that Defendant
NovaStar, as well as Ward, was Plaintiff's equitable mortgagee.
NovaStar agreed to issue the mortgage regardless of Ward's
ability to pay (Am. Compl. ¶ 35) and performed the closing
without Ward (id. ¶ 31).  Plaintiff made mortgage payments
directly to NovaStar (id. ¶ 39) and Ward and Mason, rather than
NovaStar, made the demand to settle the arrears on the NovaStar
loan (id. ¶ 40).  From these facts, its appears that NovaStar,
Mason, and Ward are alleged to have acted in concert to create a
mortgage on Plaintiff's home that was nominally in Ward's name
but dependant on Plaintiff's payments.  As Plaintiff alleges,
Ward was only a "straw purchaser" in a refinancing transaction
between Plaintiff and NovaStar.  (Id. ¶ 38.)

The Court finds that Plaintiff has set forth facts to
support a finding that she remained the equitable owner of her
home through both transactions and further that she became the
mortgagor of the mortgage issued by NovaStar on June 23, 2006.
As a consequence, she has sufficiently alleged that she engaged
in a consumer credit business transaction with NovaStar, so that
she has standing under the TILA and HOEPA.  See In re O'Brien,
2010 WL 251660, at *7-9.  She similarly may be considered a borrower
for the purposes of RESPA.  See Bieber v. Sovereign Bank, No. 95-200,
1996 WL 278813, at *5 (E.D. Pa. 1996) (holding that RESPA applies to
borrowers, but not sellers).

16

**C.   Timeliness and Rescission Claims under the TILA and HOEPA**

The determination that Plaintiff has standing and has sufficiently alleged she engaged in a consumer credit transaction with Defendant NovaStar does not resolve Defendant's motion to dismiss, however, because Defendant correctly asserts that Plaintiff's claims for statutory damages are untimely.  Under the TILA and HOEPA, claims for damages must be brought "within one year from the date of the occurrence of the violation."  15 U.S.C. § 1640(e).  NovaStar allegedly failed to make the necessary disclosures when issuing the loan on June 23, 2006 and there are no allegations suggesting any subsequent violations.  Nor does Plaintiff argue that her claims are timely for the purpose of statutory damages or that she is entitled to equitable tolling.  Consequently, the Court will dismiss any claims for damages under the TILA and HOEPA.

Plaintiff does maintain, however, that she has brought a timely claim for rescission of the equitable mortgage held by NovaStar pursuant to 15 U.S.C. § 1653(a) ["In the case of any consumer credit transaction (including opening or increasing the credit limit for an open end credit plan) in which a security interest, including any such interest arising by operation of law, is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction . . ."].  Though generally a consumer must seek to rescind within three days, where the creditor does not make the required disclosures (as alleged here), the consumer has up

17

to three years to seek rescission.  15 U.S.C. § 1635(f); 12 C.F.R. § 226.23(a)(3).  The O'Brien court explained the procedure:

> The process of rescission begins with notice to the creditor. 15 U.S.C. § 1635(a); 12 C.F.R. § 226.23(a)(2). The filing of a complaint for rescission is sufficient notice. Jones v. Saxon Mortgage, Inc., 161 F.3d 2 (table), 1998 WL 614150 at *4 (4th Cir. Sept.9, 1998); Taylor v. Domestic Remodeling, Inc., 97 F.3d 96, 99-100 (5th Cir. 1996); see also Invengineering, Inc. v. Foregger Co., 293 F.2d 201, 203-04 (3d Cir. 1961) (focusing on intent to rescind). Upon rescission, the security interest given by the borrower is terminated. 15 U.S.C. § 1635(b); 12 C.F.R. § 226.23(d)(1).

2010 WL 251660, at *15.

Plaintiff has alleged that NovaStar failed to make numerous disclosures required under the TILA, including disclosure of Plaintiff's right to rescind.  (Am. Compl. ¶ 54.)  Plaintiff notified Defendant that she intended to seek rescission through her complaint. (Id. ¶¶ 52, 55.)  Plaintiff brought this action on April 15, 2009, within three years of June 23, 2006, the date of the loan closing. Defendant NovaStar makes no argument regarding the timeliness of Plaintiff's request for rescission.  The Court finds that Plaintiff has stated a timely claim for rescission pursuant to § 1653.

**D.    New Jersey Consumer Fraud Act**

Defendant NovaStar argues that Plaintiff has failed to state a claim under the CFA, in large part based on the argument that Plaintiff was not the consumer of any goods or services provided by NovaStar, but also suggesting that Plaintiff's allegations are generally too conclusory to establish a cause of action.  To state a claim for relief under the CFA, a plaintiff must allege "1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and

3) a causal relationship between the unlawful conduct and the ascertainable loss." Bosland v. Warnock Dodge, Inc., 964 A.2d 741, 749 (N.J. 2009).

The Court finds that Plaintiff has adequately stated a claim for relief under the CFA. As discussed in Part III.B, supra, Plaintiff has sufficiently alleged that Defendant NovaStar violated the TILA, HOEPA, and RESPA.[7] She has similarly alleged that she suffered ascertainable loss (including the loss of her home) as a consequence of this allegedly unlawful conduct. (Am. Compl. ¶ 46.) Therefore, she met the three elements of a prima facie case under the CFA.[8] Moreover, consistent with the Court's determination that Plaintiff engaged in a consumer credit

---

[7] In addition, the entire foreclosure rescue scheme, in which NovaStar played an allegedly significant role (by funding the transaction, manipulating the appraisal of the home, issuing the mortgage without regard to Ward's intent or ability to pay, and hiding additional costs) may constitute an "unconscionable commercial practice" under the CFA, N.J. Stat. Ann. § 56:8-2. See Howard v. Diolosa, 574 A.2d 995 (N.J. Super. Ct. App. Div. 1990) (finding a sale leaseback scheme to be unconscionable). Because Defendant NovaStar has sought dismissal of Plaintiff's CFA claim solely on the grounds that Plaintiff was not a consumer of NovaStar's services, based on the assumption that Plaintiff played no role in NovaStar's loan, the Court will not decide whether the alleged foreclosure rescue scheme amounted to an unconscionable practice under the CFA. The issue has not been briefed by either party and so is not properly before the Court.

[8] Defendant NovaStar notes that much of Count II (the CFA claim) includes conclusory language. Plaintiff, however, incorporated her lengthy factual allegations into Count II -- allegations that set forth in sufficient detail NovaStar's alleged misconduct and Plaintiff's consequential injuries. (Am. Compl. ¶ 59.)

transaction with Novastar, Part III.B., <u>supra</u>, Plaintiff is similarly a consumer of NovaStar's loan services for the purposes of CFA liability.  <u>See</u> <u>Hundred East Credit Corp. v. Eric Shuster Corp.</u>, 515 A.2d 246, 248 (N.J. Super. Ct. App. Div. 1986) ("The term 'consumer' is only occasionally used, and is not defined, in the Act; its generally recognized meaning is 'one who uses (economic) goods, and so diminishes or destroys their utilities.'") (quoting <u>Webster's New International Dictionary</u> (2d ed.)).  Plaintiff engaged in a business transaction with Defendant NovaStar in which she received an equitable mortgage and NovaStar, in addition to a security interest in Plaintiff's home, received application and commitment fees.  (Am. Compl. ¶ 37.)  Plaintiff, as alleged, was a consumer of Defendant's loan services and so may seek relief under the CFA.

### E.  Conspiracy

Finally, Defendant NovaStar asks the Court to dismiss Plaintiff's conspiracy claim, on the grounds that Plaintiff has no independent cause of action on which to base a charge of conspiracy.  <u>See</u> <u>Middlesex Concrete Products & Excavating Corp. v. Carteret Indus. Ass'n</u>, 181 A.2d 774, 779 (N.J. 1962) ("[A] conspiracy cannot be made the subject of a civil action unless something has been done which, absent the conspiracy, would give a right of action.").  The Court has found, however, the Plaintiff has an independent cause of action under the CFA.

Moreover, Plaintiff has alleged specific facts to support her
claim that NovaStar, Mason, and Ward agreed to perpetrate their
fraudulent scheme.  See Morganroth & Morganroth v. Norris,
McLaughlin & Marcus, P.C., 331 F.3d 406, 414 (3d Cir. 2003)
(finding that civil conspiracy in New Jersey requires an
agreement between two or more persons with a common design to
achieve an unlawful purpose or a lawful purpose through unlawful
means).  According to Plaintiff, NovaStar arranged to issue the
mortgage regardless of Ward's ability or intent to pay, in order
to facilitate the arrangement.  Consequently, the Court finds
that Plaintiff has stated a claim for conspiracy.


**IV.   CONCLUSION**

For the foregoing reasons, the Court will grant in part and
deny in part Defendant NovaStar's motion to dismiss Plaintiff's
amended complaint.  The Court will dismiss Plaintiff's claims for
statutory damages under the TILA and the HOEPA as well as
Plaintiff's claim of fraud against Defendant NovaStar only.
Plaintiff may continue to seek rescission of NovaStar's equitable
mortgage on her home, and may pursue her claims under the CFA, as
well as her civil conspiracy claim, against Defendant NovaStar.
Finally, the Court will deny as moot Defendant's motion to
dismiss Plaintiff's initial complaint.

The accompanying Order shall be entered.


**March 15, 2010**                      **s/ Jerome B. Simandle**
Date                                    JEROME B. SIMANDLE
                                        United States District Judge